S-1020. Mr. Kline, haven't seen you in a while. Thank you, Your Honor. It has been a while. Your Honor, this case also involves an issue of Kline Construction. It is a more narrow appeal. The issue here is what does target operability line mean? The board construed it as a set of exactly what G.E. had, well, with slight variations in wording, which is what G.E. had asked them to construe it as, and what G.E. admitted would be construing it as the same thing as an operating line. I apologize for the similarity of these terms, but if the court could look at page five of the blue brief, I'd like to try to kind of clarify some of these. And this is a demonstrative that we used at the board, and what it does is it shows these concepts that are described in the specification. Number one is the stall or flutter boundary. What you're seeing is what's called a fan map, and it's a map of corrected mass flow rate on the x-axis against the pressure ratio across the fan on the y-axis. So generally, as the corrected mass flow rate goes up, the pressure ratio generally goes up. And what you're seeing as the red line is the stall boundary. If the fan exceeds that line, you get into an area where it may not fail immediately, but you're in an unstable flow condition from the physics of it, and it's extremely dangerous to operate in that area. So you want to stay away from that line, and what most designers do is they build an ample margin in so that you don't get too close to that line at any point in the flight shown in blue on the demonstrative graphic. And what those are is at a constant geometry, if I'm not changing the geometry at all. At the back. At the back, at the variable area, the variable axis nozzle. What I'm going to get is the engine's going to move up and down along a single blue line. If I do change the geometry, then it's going to jump to a different line and move up and down along a different line, and so on, all the way up the graph. And what you're seeing in the green line is what the specification defines and describes as the target operability line. That's a set of points, also on a fan map, that defines where I go as I move from one operating line to another as I'm changing the geometry. What the error here that we allege is that the board erred by ignoring the definition the inventors gave target operability line in the specification. The term is defined there, and under Cuozzo and in Ray Smith, the board should have looked at that location. Tell us where that's defined in there. I'm sorry, Your Honor? Where is that definition? The definition that we proposed would be it's a set of points that connects the different operating points on different operating lines as you jump from operating line to another. As you jump from one to another. It would be the green line on page five. On page five. I think you said that the specification defines it, and I took Judge Raymond's question to be where exactly does the specification define it? The specification starts in the abstract by defining those three concepts and the space between where you are actually operating and the stall margin. Take us through the record. Appendix at 43. It starts with the abstract. There's a definition there of moving the operating line toward the stall or flutter boundary to reduce the operating margin. That's the whole point of this invention. I don't want to suffer where the designer put me on the fan map. I want to get closer to the stall margin without going over it because it gives me better fuel efficiency, better performance by closing down that operating margin. And you're going to do that with a controller that modifies the nozzle. Correct. Based on flight conditions. So, I can constantly monitor where I am on that fan map and I can adjust the nozzle so that I'm moving myself toward that boundary without going over it throughout the flight envelope. That's simply what the invention is. So, at page 46, column one, lines five to seven. Again, the invention relates to managing fan operability. Very clear statement. At lines 16 to 19, that I'm going to, fan operating line can be manipulated during engine operation to ensure that the operability margin is sufficient. At lines 22 to 24, I'm going to do this to meet desired fan operability conditions. At 24 to 26, I'm going to do it throughout the flight envelope. And again, at 37 to 40, I'm moving this line throughout the flight envelope using this controller. If you look down at column one again, at line 56 to 62, there's a very clear statement. A change in the effective nozzle exit area is used to move the operating line toward a turbofan stall or flutter boundary by manipulating the turbofan pressure ratio. As a result, engine operating conditions, and normally have a necessarily large operating conditions with conventional fixed nozzles, can be made more efficient. And then at the last place I'd direct the court is at column three, at lines 30 to 37. A change in the effective nozzle area, which changes the turbofan pressure ratio, is used to move the operating line toward the stall or flutter boundary of the turbofan 22 to a target operability line. And to skip over the next sentence, better fuel consumption, for example, is achieved by decreasing the turbofan pressure ratio toward the stall or flutter boundary, which decreases the fan operability margin. So what we see in these portions of the spec is really four things. I'm going to change the variable area nozzle. And when I do that, I'm changing the bypass ratio of the engine. I'm going to move it closer to the operating line, closer to the stall line, moving the operating line closer to the stall or flutter boundary or margin. And when I do that, it's going to reduce the operability margin. And when it does that, it's going to increase fuel efficiency and increase performance. And I do all that through the controller. Surprisingly, the board made a number of findings that are entirely consistent with that explanation that I just gave you. They found, and this is the appendix at eight in the board's opinion, the parties agree that a given fan operating line identifies how the plotted performance characteristics of the fan having a constant nozzle exit area will change with changing throttle inputs. And then a few lines later, that each fan operating line illustrated in Willis and Mattingly fan maps corresponds to one nozzle area configuration. So they're agreeing that there is no dispute in this case. The parties agree that the operating line is at a fixed geometry. And then they continue. The specification repeatedly, this is at line at page 12, the specification repeatedly uses the terms operability and operating. These discussions suggest a difference in meaning between a fan's target operability line and the fan's operating line. And then again at page 12 and again at 13, the operating line is different than the operability line. And at 12, the 513 patent establishes a difference in meaning between the fan's target operability line and operating line. And that difference, this is appendix at 13, is optimizing the fan operability margin. The board also concedes that the concept of optimization is contained in the specification. So how did we go awry here? The board seems to be making factual findings, based on the intrinsic evidence at least, that are consistent with the construction that we had proposed. They then basically construe the term at 13 and 16 as a set of points on a fan map at which the fan is designed to operate, which is the same thing GE had been urging for operating line. So at some point, they simply decided that they were not going to follow their own findings or follow the specification and construed these two terms as the same. The reason we believe they did so is that GE had made arguments that UTC allegedly gave away the farm during prosecution by making certain admissions. And again, as we talked about in the last appeal, we believe those statements are grossly overplayed by GE in this case. The office action is at page 2564 of the appendix. And what the examiner cited was, it's not clear to me whether this target operability line is talking about a characteristic of the spool, the entire apparatus of the turbine, the shaft, and the compressor, or whether it's talking about the fan. And what we did is responded that, and this is appendix at 2573, the term target operability line is clearly understood in the art. Again, it was a definiteness rejection, not a claim construction issue. The meaning of this term is set forth in many industry documents, for example, SAE document, AIR 1419. And then it continues, an operating line or operational line may be expressed by multiple operating points. Absolutely correct. But it is not a definition of target operability line. The operating line represents a location on a map where an engine may operate without encountering instability. And then they respond to the examiner's rejection, which was the target operability line relates to the turbofan or fan and not the spool. This is by no means an admission or concession of the nature that GE is arguing here. The examiner was confused. Does it relate to the fan or the spool? We responded and amended the claims to make it clear that it relates to the fan. We defined operating line as- Can you help me out on one thing? Yes, Your Honor. So if you go back to where you started, 2564, the paragraph 4, which is, I think, the key paragraph in the initial rejection, is the as-best-can-be-determined sentence at the very end of that paragraph? Yes. Is there something garbled grammatically about that? I don't- Yes, I think so. It's not as clear as it could be. What do you think the intended correct version is of that sentence? The limitation appears to be in the operation of the low-pressure spool during operation of the engine is defined a fan operating line. Yes, I think it is somewhat garbled, but I think what he's asking, at least what we understood him to be asking, is it's not definite, not clear to him whether this limitation relates to the fan or the spool. And that's what we responded saying it relates to the spool. And since it was a definiteness rejection, we also said one of ordinary skill in the art would understand what the term target operability line means. And then if I'm remembering right, what you pointed to were things specifically about terminology of operating line and some variant on operating line, but not operability line. Yes, we did, we said that the document that we referred to, the SAE document, defines operating line. What page, 2573? That's 2573. And then answer the question, direct the question specifically about whether it relates to the fan or the spool by saying the target operability line relates to the fan. So, what this statement does not do is define target operability line as merely a set of points on a fan map where the engine operates. That's what an operating line is. And to convolve the two, as GE has done, is simply wrong and is inconsistent with the specification. There is also evidence of record from the experts that makes it clear that they agree. So, for example, we had submitted testimony from Dr. Benini, who was our expert, and he had indicated that that is also the case. We had also deposed Dr. Atia, who was GE's expert. And what he stated specifically was that this was an unusual term. It was an unconventional term. One would have understood what it means, but it was not something that was a term of art in the industry. Which, again, what GE has tried to convince the board to do is that they could ignore the specification, which, as I've read earlier, makes very clear what this operability concept is and that it is different than an operating line. Based on that error, we do believe the board has erred in construing the claims, specifically the target operability line, which is a set of points that connects where you jump from an operability margin and equating it to an operating line. Under In re Smith, this leaves its conclusion of anticipation and obviousness without substantial evidence support. We urge the court to reverse rather than vacate for further findings because the issues were flushed out fully below, and there's an ample record here to resolve this issue. Under the correct construction, there is no substantial evidence. The specification, does it disclose the optimizing operability margin as being absolutely required? Well, it describes it as being the invention itself. As the portion I read originally. So, for example, the first excerpt that I read, the invention manages to- A lot of that seemed to be a characteristic or a trait, and I tend to agree that there's quite a bit of language in the specification that would tend to support your construction, but does it require it? Yes, Your Honor. It does require it. Because the entire specification describes that we're managing operability. That's the first line I read out of five to seven, and the claim limitation itself is target operability line. And what you're saying, it's describing what that means, and then the claim itself is saying, I am going to move this to a target operability line, which is closer to the stall or flutter margin. It's not a quantitative value, but it's a qualitative value. I have to be closing that operability gap, closing that margin. With respect to the Willis reference itself, Willis does not disclose anything like a target operability line. Your Honor, I see I'm well into my time. If I could reserve a minute or two to finish. Yes, you may. Okay. Thank you. Thank you. Mr. Ferguson? Thank you, Your Honor. May it please the Court? I guess it's good afternoon now. We need to be very clear here about what has taken place. UTC believed, when it wrote this patent, that the idea of taking a variable area fan nozzle, adjusting it on the fly while the engine is moving, and being able to move from one fan operating line, which is an understood term, to a different fan operating line in order to improve engine performance was a patentable invention. And they called that the target operability line in the claim. In the petition, they found out that that was not the case because Willis specifically disclosed, you can look at Appendix 2767 and 2768, I'll hold it right here for you. That's the picture that's everywhere, right? Right. 2768, well, it's everywhere with respect to Willis. This is a fan operating map. There is a SLS, sea-level static, operating line that Willis was designed for. You can see it's a fan operating line. Willis describes the use of a variable area fan nozzle to then, as the plane reaches cruise, to close that nozzle, which causes the fan operating line to move to the altitude cruise operating line, which is higher up on the fan map. It has a higher pressure ratio. And that is another fan operating line at which the engine is designed to operate using the variable area fan nozzle. And that is precisely what UTC has described in the background section and in the summary of the invention section in the patent. The idea of moving from one fan operating line to another in order to improve engine performance. Willis specifically stated on page 2767 that the takeoff operating line was selected to keep jet velocity low for reduced noise. That's an engine performance, unequivocal. He then describes how you move to a higher operating line for the cruise point, and you do that by closing the variable exhaust nozzle to increase thrust at altitude. That's another engine performance, increasing thrust. This is exactly what the board found. So what does UTC do after it receives the petition and we get instituted? They decide, well, we can't call the target operability line the operating line that you want to be at. We have to come up with something different. And they came up with their drawing, which is in their blue brief, several places, where they described for the first time this idea of we're not talking about being on different operating lines, no, no. We're talking about connecting points, connecting the dots between different operating lines, and that's the target operability line. That is exactly the opposite of what they told the Patent Office and what they told the European Patent Office. During the U.S. prosecution... So the term fan operability, that's a term of art, right, in the industry? It is, yes. Yes. Fan operability. What was target operability line? Target operability... They created that? They claim that they coined or made up the term target operability lines. It is in the patent. There's no question it's in the patent. There's various references to it in the patent. They used the term target operability line in the patent. There's no doubt about that. But what's important is what they told the Patent Offices, both U.S. and European, what that meant in order to overcome rejections. The examiner in the U.S. prosecution specifically said at 2564 that the term was indefinite because the specification does not describe what is the meaning of the term. That's contrary to the position that they're taking now that the specification does describe it. And in response, what did UTC say? They did not say that this was a term that they had made up and were defining in the specification. They said the exact opposite. They said that the term is clearly understood in the art. And they cited the SAE document, which I guess is 2575 to 2577. Exactly. And does that document in those three pages with extremely small font use the term operability line or just operating line? It uses only the terms operating lines. It is referring to traditional fan operating lines that a person of ordinary skill would understand. So and then after submitting that, and in fact, Your Honor, at 2576, there's actually at the top, the drawing, it says fan operating line, fan on operating line. That's a traditional fan operating line. That's what they said. That's what they told the Patent Office. Their target operability line was a fan operating line. Operating lines is actually circled. After doing that, the examiner agreed. And he said the SAE document in the remarks overcomes the indefiniteness rejection. So the Patent Office relied specifically on their representation that a target operability line was already well known in the art and it was a fan operating line. But they didn't stop there. During European prosecution. Can you just, can I ask you the same question I asked Mr. Coyne? If you go back to the initial rejection of 2564, can you parse that as best can be determined sentence for me? And I may just be blind to why it actually does scan grammatically. I'm not seeing it. I don't think it's written in the best grammar. I agree. I believe, so what is known is that the low pressure spool is actually connected to the fan. Right. So the low pressure spool is what spins the fan. This is one with a gear or not a gear? Doesn't matter. Doesn't matter. Okay. Right. So, well, I mean, for the most part, we're dealing with gears here. It's the low pressure spool that is connected to the fan. Okay. Through the gear. So I believe what he may be saying here is that as best he understands it, it's the operation of the spinning of the low pressure spool to spin the fan is defining the fan operating line. Defining would help a little bit. Probably. I mean, that may be what's wrong. Yeah.  Defined as a fan operating line, perhaps. But I think what's important is the sentence up at the beginning where he says that the term is not clear because it's not described in the specification. Now, going back to the European prosecution, it's even more clear what UTC did. Is that really accurate? I mean, when you look at the specification, it does tell you in various places what that means. It doesn't, Your Honor. I respectfully disagree. There is no spot in this specification where it defines. What about the spots that they cited to? Everything that Mr. Coyne cited to here with respect to, for example, where it says a change in the effective nozzle exit area is used to move the operating line toward a stall or flutter boundary by manipulating the turbofan pressure ratio. That is exactly, exactly what Willis is disclosing here. Close the nozzle and jump to a new operating line that is closer, that has a higher pressure ratio, so therefore it's closer to the stall line. There is no statement in this specification whatsoever that contains the definition that UTC says the claim terms mean. If there was, then why is it that a European examiner said that the specification doesn't contain a definition? The U.S. examiner said it doesn't contain a definition. Three technically trained administrative law judges said it's not described or defined in the specification. So, now you have a circuit court judge that's looking at this at column one. This is in the pen down around line 46. It says the target operability line provides the desired fuel consumption, engine performance, and or fan operability margin. It references the fan operability margin as one of the desired effects, but it also describes it as the desired fuel consumption. So, it seems to me that the fan operability margin is just an indication as you build thrust, you move up that fan line, but that the target operability line is a line that describes the best fuel consumption, engine performance, and the fan operability margin at different parts of a flight. That's where you want to be. Right. You want to move, right, you want to move from the existing operating line to a different operating line depending on what the engine performance is, depending on where you want your engine to be. Okay. But that statement that you just read, your honor, is not UTC's claim construction. Their claim construction is that it's a line connecting points across different fan operating lines that optimizes fan operability margin. That is not the portion of the specification that we just looked at. The portion of specification we just looked at says the target operability line provides desired, not optimized, fuel consumption, engine performance, and or fan operability margin. What UTC wants to do is they want to strike from that fuel consumption and engine performance. They want to change desired to optimized, and then they want to take that reworded portion of the specification and put it into their claim construction. That's not, that doesn't follow the canons of claim construction. If the definition of target operability line is that sentence, then it's undisputed that Willis discloses precisely that. It discloses being on one fan operating line at one operating condition and then moving to a second one at another operating condition in order to improve engine performance. Undisputed. That is what the board said. Again, I want to go back to the European prosecution because I think it's important. At Appendix 3284, the European Patent Office said, again, that this term target operability line is vague and unclear, and leaves the reader in doubt as to the meaning of the technical features as to which it refers, therefore rending the definition of the claims unclear. And what did they do in response? Again, they filed a statement where they say at Appendix 3300, we believe the term target operability line would be entirely clear to the skilled person as being a term in the art. How could that be consistent with their statement that they made up the term for the first time in this patent? For example, they submit figure one, which shows a typical fan map, which shows typical plots of target operability lines, the claim term. When you look at that page, which they submitted 3309, they specifically show two target operability lines or operating lines. They equated the terms specifically in the submission. It's at Appendix 3309, and those two lines, which they called either target operability line or operating line, are exactly like the two operating lines in Willis. These statements in the file histories are unequivocal, persons of ordinary skill in the art are entitled to rely on them in determining what the true meaning of this claim term is. The last point I want to make is that as the board found, the term optimizing fan performance is not in the specification. It's desired fan operating margin is what the specification says. And as the board said, if we put that into the claim construction, what does that mean? How does a person of ordinary skill know if they are optimizing fan operating performance so that they're within the scope of the claim or not, so that they're outside the scope? Certainly, the specification, which contains two columns, doesn't provide that type of guidance. If UTC truly wanted to define the term as they say they did, it was incumbent upon them under this court's precedent in pacing tech v. Garmin to clearly and unambiguously put that definition into the specification, and they failed to do so. So because Willis discloses moving from one fan operating line to another fan operating line in order to improve engine performance, the board's claim construction was correct, and the board's determination that these claims were anticipated by Willis was also correct. Can I ask you a very small question? Sure. In 3309, what does MN stand for? MOC. That's MOC. Oh, the MOC number? Yeah, exactly. So the N is just a reference. It's a variable. Okay. Okay, thank you. Thank you, Your Honor. At this point, you have three minutes. A couple of points very briefly where I left off. With Willis, Willis noise is not among the performance criteria. How do we know that? Because the patent tells us that specifically. At appendix of 46, column 3, lines 10 to 12, the specification expressly distinguishes performance referred to in the question you are asking, Your Honor, from other operating parameters of the fan. And what it says is this enables desired engine operation moving toward the stall margin. This enables desired engine operation over a range of flight conditions with respect to performance and other operational parameters such as noise levels. So what the inventors are doing is distinguishing fuel efficiency and performance on one hand from other types of operational parameters, noise, for example, or other parameters. We also know that what Willis is disclosing, it may be an operating line, it may be a series of operating lines. He may be moving from one operating line to another, but he's not doing it to reduce the operability margin. Willis specifically provides, basically in his specification, he lists a number of places where he is essentially saying what he's doing is controlling noise. At 2765, 2784, 2911, 2945, and 2972, each of these places he makes it very clear what he's doing is controlling a constant Mach number. He wants to limit the noise the fan is generating. So what he does is he keeps the inlet speed, the amount of corrected mass flow coming into the engine at a constant. If you look at the graph my colleague identified for you, look at where those two points line up. They line up exactly where these five places I read said, around 0.75 to 0.80 Mach number. It's a straight line up and down. There is no conception in Willis of optimizing, reducing, moving toward a stall or flutter boundary. What he's doing is maintaining a constant noise level, a constant Mach number to limit noise. That is not the same as a target operability line, which you have to move toward the stall or flutter boundary. With respect to the question of whether this was known, Dr. Attia and Dr. Benini both testified that this term was not known. So for example, at 3637, paragraph 44, Dr. Benini testified that this term, target operability line, was unique to the 513 patent. We asked Dr. Attia the same thing. Had he ever heard the term before? And he said he had not heard the word target operability line before the 513 patent. That's an appendix at 3550, page 36, lines 6 to 9. And then what is very interesting, we asked him further about that at 3553, page 39, lines 10 to 17. And what he said, that is an unusual word in, as I understand fans and compressors, and that has been the majority of my experience is with fans and compressors. It is unusual, is an unorthodox. I understand what the word means, but it's an unusual word. So, GE is using all this to try to... The word target? The word target operability is the word that he's discussing. Not operability, that's not... Well, target operability line is the phrase they were discussing. It's got to be target, right? It's got to be a target, and it's got to be based on operability. That was new. That is the point. With respect to the further point that these are three alternative... What are all the other lines on the prior art reference on that chart? Well, first off, there is no stall margin shown. No, but they're targets. Well, he doesn't show any... No, there aren't targets because... It's defining you got to stay below your stall line or you're going to stall. That is absolutely true, but he is not showing you where the stall line is because he has no conception in this invention, this paper, about operability at all. What he's doing is he's maintaining these points at a constant Mach number, 0.79, to limit noise. He doesn't even show you a stall or flutter boundary on here. There's no way to determine where the stall or flutter boundary is because that's not one of the concepts he was even dealing with in this reference. He was trying to do something completely different. And the two portions I mentioned to you previously, really... I'm sorry, Your Honor, I see that my time is over. If I may just finish the sentence. Okay, this concept that these are different things, they're not different things. The portions I read you from the spec make it clear that when I move this to reduce the operability margin, I am increasing performance and fuel efficiency. They're not independent variables that the board could pick and choose among. They're the same thing. When you improve the operability margin, you improve your full efficiency and your performance. Thank you, Your Honor. We thank counsel for all the arguments this morning. This court now stands in recess.